[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
{¶ 1} Appellant, Ned Kramer, appeals a September 5, 2002 judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which overruled his objections to the decision and recommendation of the trial court's magistrate, who granted permanent custody of appellant's minor son and daughter, Phillip and Rachel Kramer, to Franklin County Children Services ("FCCS") for purposes of adoption. While the court's order also terminated the parental rights of Phillip and Rachel's mother, Cleta Kramer, she has not appealed the trial court's judgment and is not a party to this action.
 {¶ 2} On January 27, 2000, FCCS filed two complaints alleging that Phillip and Rachel Kramer were abused, neglected, and/or dependent children. Phillip and Rachel Kramer first came to the attention of FCCS when an allegation was made that the children had been physically abused by Henry Pope, a friend of the Kramer family. An investigation was conducted by the Columbus Police Department and FCCS, and in April 2000, a hearing was held at which time custody of both children was temporarily placed with FCCS.
 {¶ 3} Phillip and Rachel Kramer were initially removed from their parents' home in August 1999. According to the trial court, the circumstances causing the removal of Phillip and Rachel were "shocking." (Sept. 5, 2002 Decision, at 1.) We agree.
 {¶ 4} The investigation by the Columbus Police Department and FCCS revealed that Phillip and Rachel were kept as virtual prisoners in their home. Phillip and Rachel were allegedly "home schooled" and were rarely allowed to leave the confines of their house. The children were also beaten severely by a family "friend" at the direction, knowledge and/or acquiescence of their parents. Incredibly, these beatings often occurred in the basement of the home while Ned and Cleta were upstairs. Phillip and Rachel's "discipline" usually consisted of beatings with a leather whip which had a piece of metal attached to its end, yelling and/or screaming of profanities, burns, as well as torture with electricity. As a result of this abuse, both Ned and Cleta were indicted and charged with child endangerment in violation of R.C. 2919.22. Both pled guilty to four counts of child endangerment, and each was incarcerated for a period of six years.
 {¶ 5} After the investigation uncovered the abuse of the Kramer children, Phillip was placed in the home of Ned's niece, and stayed with her and her husband. Rachel was placed in the home of Ned's brother, and stayed with her uncle and his wife. On September 11, 2000, FCCS filed a motion for permanent court commitment of both children. The motion was tried before the trial court's magistrate on January 17, 2002. Three witnesses testified at the hearing, and each witness was examined, and cross-examined, by counsel for the appellant and FCCS. The indictments and sentencing entries of both Cleta and Ned were introduced and accepted as evidence. On January 30, 2002, the magistrate issued a decision granting FCCS's motion for permanent commitment.
 {¶ 6} On February 12, 2002, appellant filed a short objection to the magistrate's decision with a one-page memorandum in support. The substance of appellant's objection consisted of the following paragraph:
 {¶ 7} "Given the evidence produced at hearing, the decision of the magistrate was an abuse of discretion and against the manifest weight of the evidence. Moreover, Mr. Kramer was denied his due process and equal protection rights under both the United States and Ohio Constitution when the lower court [sic] refused to stay the proceedings pending final resolution of the collateral criminal matter." (Appellant's objection, at 2.)
 {¶ 8} Due to the brevity of the motion, oral argument on appellant's objection was conducted on July 25, 2002, and a decision overruling the objection was released by the trial court on September 5, 2002. Thereafter, appellant filed a notice of appeal, raising the following three assignments of error:
 {¶ 9} "[1.] There is insufficient credible evidence to support the judgment of the trial court which is otherwise against the manifest weight of the evidence.
 {¶ 10} "[2.] The trial court erred in accepting the guardian ad litem's report after the hearing, thereby denying appellant his procedural and substantive due process rights.
 {¶ 11} "[3.] Appellant was deprived the effective assistance of counsel."
 {¶ 12} In his first assignment of error, appellant argues that the court's order is against the manifest weight of the evidence.
 {¶ 13} R.C. 2151.414(B) regulates the termination of parental rights of a natural born child when that child has neither been abandoned nor orphaned. Pursuant to R.C. 2151.413, a children services agency which has temporary custody of a child is permitted to file a motion seeking permanent custody under certain enumerated circumstances. When a motion for permanent commitment has been filed, R.C. 2151.414(A)(1) directs the trial court to conduct a hearing in order to determine if an award of permanent custody is in the best interest of the child. "Upon the filing of a motion pursuant to section 2151.413 of the Revised Code for permanent custody of a child, the court shall schedule a hearing and give notice of the filing of the motion and of the hearing * * * to all parties to the action and to the child's guardian ad litem. * * *" R.C.2151.414(A)(1).
 {¶ 14} The court may grant permanent custody if the court finds, by clear and convincing evidence, that the change in custody is in the best interest of the child, and that the child cannot or should not be placed with either of the child's parents within a reasonable amount of time. R.C. 2151.414(B) provides:
 {¶ 15} "(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 16} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 17} "(b) The child is abandoned.
 {¶ 18} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 {¶ 19} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
 {¶ 20} R.C. 2151.414(D) provides that when determining whether a permanent change in custody is in the child's best interest, the court shall consider the following:
 {¶ 21} "In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:
 {¶ 22} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 23} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 24} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 25} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 26} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 27} The agency seeking the change in custody must also demonstrate that reasonable efforts have been made to reunite the parent(s) and child, or that such efforts would be futile. R.C. 2151.414(E) provides:
 {¶ 28} "In determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 {¶ 29} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties;
 {¶ 30} "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
 {¶ 31} "(3) The parent committed any abuse as described in section2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03
of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
 {¶ 32} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 {¶ 33} "(5) The parent is incarcerated for an offense committed against the child or a sibling of the child;
 {¶ 34} "(6) The parent has been convicted of or pleaded guilty to an offense under division (A) or (C) of section 2919.22 or under section2903.16, 2903.21, 2903.34, 2905.01, 2905.02, 2905.03, 2905.04, 2905.05,2907.07, 2907.08, 2907.09, 2907.12, 2907.21, 2907.22, 2907.23, 2907.25,2907.31, 2907.32, 2907.321, 2907.322, 2907.323, 2911.01, 2911.02, 2911.11,2911.12, 2919.12, 2919.24, 2919.25, 2923.12, 2923.13, 2923.161, 2925.02, or 3716.11 of the Revised Code and the child or a sibling of the child was a victim of the offense or the parent has been convicted of or pleaded guilty to an offense under section 2903.04 of the Revised Code, a sibling of the child was the victim of the offense, and the parent who committed the offense poses an ongoing danger to the child or a sibling of the child.
 {¶ 35} "(7) The parent has been convicted of or pleaded guilty to one of the following:
 {¶ 36} "(a) An offense under section 2903.01, 2903.02, or 2903.03
of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
 {¶ 37} "(b) An offense under section 2903.11, 2903.12, or 2903.13
of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 {¶ 38} "(c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
 {¶ 39} "(d) An offense under section 2907.02, 2907.03, 2907.04,2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 {¶ 40} "(e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.
 {¶ 41} "(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
 {¶ 42} "(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
 {¶ 43} "(10) The parent has abandoned the child.
 {¶ 44} "(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 or 2151.415 of the Revised Code with respect to a sibling of the child.
 {¶ 45} "(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.
 {¶ 46} "(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.
 {¶ 47} "(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
 {¶ 48} "(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.
 {¶ 49} "(16) Any other factor the court considers relevant."
 {¶ 50} Clear and convincing evidence has been defined by the Ohio Supreme Court as:
 {¶ 51} "* * * [T]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." In Re Estate of Haynes (1986), 25 Ohio St.3d 101, 104.
 {¶ 52} "Once the clear and convincing standard has been met to the satisfaction of the [lower] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof." In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368, citing Cross v. Ledford (1954), 161 Ohio St. 469. See, also, In re Adoption of Lay (1986), 25 Ohio St.3d 41, and In re Adoption of Masa (1986), 23 Ohio St.3d 163, 166. A trial court's ruling in a permanent custody case will not be reversed on appeal so long as it is supported by competent, credible evidence going to all the essential elements of the case. State v. Scheibel (1990), 55 Ohio St.3d 71, 74.
 {¶ 53} Before proceeding, we note that issues or arguments relating to the credibility of witnesses and the weight to be given to any particular testimony or evidence, are issues which are left to the trier of fact. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,80. We also note that it is well-established that this court, even if we were to decide the issue differently had we been the court of first impression, will not merely substitute its judgment for that of the lower court so long as the judgment of the lower court is supported by competent and credible evidence.
 {¶ 54} At the hearing in this matter, in addition to the documentary evidence before the court, three witnesses testified and were examined by counsel for the appellant and FCCS. The first witness called to testify was Columbus Police Detective Susan Purtee. Detective Purtee testified that she conducted the initial investigation of Ned and Cleta and concluded that the Kramer's had allowed Henry Pope to abuse and torture their children. According to Detective Purtee, the Kramers had encouraged, allowed, and/or acquiesced in Pope's physical and mental torture of their children. Detective Purtee testified that it was common for Ned and Cleta to call Pope and ask him to come over to their house to discipline the children. Often the Kramers remained upstairs while Pope beat the children, screaming obscenities at them as he did so. Needless to say, their cries for help fell on deaf ears. As a result of her investigation, Detective Purtee filed criminal charges against all three individuals, who were all later indicted and charged with various offenses.
 {¶ 55} The second witness called to testify was FCCS caseworker, Lois Bare. Ms. Bare testified that Ned and Cleta had been incarcerated for some time prior to the hearing, and would continue to be incarcerated for a number of years as they both had received six-year terms as a result of their conviction for child endangerment. Ms. Bare testified that once the abuse of the Kramer children came to light, Rachel had been placed in the home of her uncle and had continued to reside with him and his wife. She testified that during her numerous monthly visits, she observed Rachel to be very comfortable living with her aunt and uncle. In her own words, she stated that Rachel's relationship with her aunt and uncle was "[v]ery bonded. Very loving. Very comfortable with each other." (Tr. at 45.) When asked how Rachel refers to her aunt and uncle, she stated that she thought of and referred to them as her mom and dad, while she referred to appellant and his wife as Ned and Cleta. (Tr. at 45-46.) Importantly, at no time did Ms. Bare observe anything which would lead her to believe that Rachel was being mistreated or was living in anything but a safe and nurturing environment. She also observed that Rachel's aunt and uncle were very bonded with Rachel. Id.
 {¶ 56} Ms. Bare testified that when Phillip was removed from the care of Ned and Cleta, he was placed in the home of Ned's niece, and had continued to live with her and her husband. During her visits to check upon Phillip, Ms. Bare explained that he was always healthy and treated very well. (Tr. at 51.) When asked about the interaction between Phillip and his caretakers, she stated that it was "very bonded. Very loving. Very appropriate." (Tr. at 52.) Like Rachel, Phillip referred to his cousin and her husband as his mother and father, and they too were very bonded with Phillip. (Tr. at 52-53.)
 {¶ 57} The third and final witness to testify was FCCS caseworker Kimberly Zelasko. At that time, Ms. Zelasko was the current caseworker assigned to supervise the placement of Phillip and Rachel. Accordingly, she also conducted numerous monthly visits with Rachel and Phillip to ensure that they were being adequately cared for. Concerning Rachel, Ms. Zelasko testified that she observed numerous pictures of Rachel together with her aunt and uncle, and many framed pieces of art on display in their home which had been created by Rachel. (Tr. at 61.) Ms. Zelasko stated that she observed Rachel to be well-treated and healthy. When asked about their relationship and interaction, she testified that "[I]t's very warm and loving. Often during our visits, Rachel — Rachel likes to show and tell. She'll bring crafts that she and [her aunt] are making. She brings and shows me books that she and [her aunt] are reading. She'll also sit very close to [her aunt]. There are times where she will lay her head on her lap." (Tr. at 62.) According to Ms. Zelasko, Rachel and her aunt and uncle have bonded, and Rachel and her aunt are especially close. (Tr. at 63.) Rachel calls her aunt and uncle mom and dad, and Ms. Zelasko stated that they have a very positive living arrangement.
 {¶ 58} When asked about her visits with Phillip, Ms. Zelasko confirmed that Phillip was healthy and happy, and was treated well by his cousins. When asked whether she thought Phillip had bonded with his new caregivers, she stated, "[h]e's bonded to them. They provide him with food and snacks and they interact with him with his toys when they play." (Tr. at 66.) In her opinion, they have bonded as a family, and Phillip considers his cousins to be his mother and father. (Tr. at 67.)
 {¶ 59} Having carefully reviewed the record, we find that the trial court's judgment in this case complies with the requirements set forth in R.C. 2151.353(A)(4) and 2151.414(B)(1)(a); i.e., we find that the trial court properly determined that granting permanent custody of Phillip and Rachel is in the children's best interest, and that the children cannot be placed with either of the parents within a reasonable amount of time.
 {¶ 60} The trial court specifically found that several of the 16 factors listed in R.C. 2151.414(E) are applicable in this case. First, pursuant to R.C. 2151.414(E)(5) and (12), Phillip and Rachel cannot be placed with their parents due to Ned and Cleta's present incarceration for offenses committed against the children. Second, appellant and his wife were incarcerated at the time of the filing of the motion for permanent commitment and will remain incarcerated for at least 18 months after the filing of the motion. Specifically, Ned and Cleta were sentenced to six-year prison terms on June 15, 2000, on four counts of endangering a child. The victims in this case were Phillip and Rachel, in addition to their four other siblings, and the motion for permanent commitment was filed on September 11, 2000, after appellant's sentencing. Additionally, the trial court found that pursuant to R.C. 2151.414(E)(7)(c), a child cannot be placed with a parent within a reasonable time if the parent has been convicted of an offense under R.C. 2919.22(B)(2) involving child endangerment and torture or cruel abuse.
 {¶ 61} The court also determined that the children were both treated very well in their current homes, and that they had both bonded with their caregivers. The court found that both Phillip and Rachel's future has been uncertain, and that they are both in need of permanency and consistency. Finally, the court determined pursuant to R.C.2151.414(B)(1)(d) that the children have been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period ending on or after March 18, 1999.
 {¶ 62} Having reviewed all of the evidence in conjunction with the trial court's analysis, we are unable to agree with the appellant that the trial court's decision in this case is either based upon insufficient evidence or is against the manifest weight of the evidence. Appellant's argument that he was not the "abuser" in this case, and therefore "a meaningful relationship could be reestablished," along with his claim that the "children in this matter were not apparently traumatized to the extent of needing counseling," rings particularly hollow. Accordingly, appellant's first assignment of error is overruled.
 {¶ 63} In his second assignment of error, appellant contends that the trial court erred in accepting the guardian ad litem's report in this case. R.C. 2151.414(C) provides that a written report of the guardian ad litem of the child shall be submitted to the court prior to, or at the time of, the hearing held pursuant to division (A) of this section.
 {¶ 64} Appellant contends that because the guardian's report was filed along with the trial court's judgment entry, the "mandates" of R.C. 2151.414(C) must not have been followed because the report "must" have been submitted after the hearing. We disagree.
 {¶ 65} First, appellant failed to raise this issue before the trial court. The failure to raise an issue in the trial court waives a litigant's right to raise that issue upon appeal. State v. Comen (1990),50 Ohio St.3d 206. The foundation for this rule is that parties should be foreclosed from having an opportunity to try issues not litigated, or not fully litigated in the lower court, or issues upon which the lower court made no express finding. Crestmont Cleveland Partnership v. Ohio Dept. of Health (2000), 139 Ohio App.3d 928. See, also, Juv.R. 40(E)(3)(b).
 {¶ 66} Second, on its face, the rule does not require that the report be filed and time-stamped by the court's clerk's office prior to the hearing; rather, only that it be submitted to the court prior to the hearing. In this case, appellant's argument in support of his assignment of error amounts to no more than mere speculation, and is unsupported by any evidence that the guardian's report was not submitted to the court prior to the hearing. Indeed, the report was time-stamped on the same day that the magistrate's decision was filed. Thus, it is an equally likely assumption that the report was submitted prior to the hearing of the magistrate and of the court. We are unwilling to reverse the decision of the trial court upon mere speculation. Therefore, appellant's second assignment of error is overruled.
 {¶ 67} In his third assignment of error, appellant claims that he received ineffective assistance of counsel because: (1) counsel failed to call witnesses to testify as to what was in the children's best interest; (2) counsel failed to scrutinize the report of the guardian ad litem; and (3) counsel failed to call the guardian as a witness in order to examine him regarding his report.
 {¶ 68} As the United States Supreme Court explained in Strickland v. Washington (1984), 466 U.S. 668, 669, 104 S.Ct. 2052, "[t]here are countless ways to provide effective assistance in any given case." As such, the essential question is whether counsel acted "outside the wide range of professionally competent assistance." Id. at 690.
 {¶ 69} The proper test for judging a claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial process cannot be relied upon as having produced a just result. Id. To succeed on a claim of ineffective assistance of counsel, a client must satisfy a two-prong test. First, he must demonstrate that counsel's performance was deficient. Id. at 687. To meet that requirement, the client must demonstrate that counsel committed errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment to the United States Constitution. The client may prove deficient conduct by identifying acts or omissions that were not the result of reasonable professional judgment, and in light of all the circumstances, that the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690. Second, if the client is able to demonstrate that counsel's conduct was deficient, the client must then demonstrate that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. State v. Bradley (1989), 42 Ohio St.3d 136.
 {¶ 70} As to both elements of an ineffectiveness claim, the United States Supreme Court explained in Strickland:
 {¶ 71} "* * * First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction * * * resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.
 {¶ 72} The courts of Ohio, as well as the courts of the United States, have repeatedly declared that properly licensed attorneys are presumed to be competent. See id; Vaughn v. Maxwell (1965),2 Ohio St.2d 299. Thus, courts indulge "`a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *.'" State v. Bradley (1989), 42 Ohio St.3d 136, 142, quoting Strickland at 689.
 {¶ 73} In State v. Frazier (1991), 61 Ohio St.3d 247, the Ohio Supreme Court explained:
 {¶ 74} "* * * [T]he Strickland court strongly cautioned courts considering the issue of ineffective assistance of counsel that `[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. * * * Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."'" Id. at 253.
 {¶ 75} Having carefully and thoroughly reviewed the record, we are unable to conclude that the performance of appellant's trial counsel fell below an objective standard of reasonable representation, or that appellant was materially prejudiced by counsel's alleged substandard performance.
 {¶ 76} Under the circumstances, we do not believe that counsel's decision in this case to forego calling certain unnamed individuals to explain to the court what is in the best interest of Phillip and Rachel constitutes substandard performance, for the reason that the determination of what is in the children's best interest is a determination specifically entrusted to the trial court. However, even if these unknown witnesses were to testify to this legal determination, it is mere speculation what the testimony of these witnesses would have been, and that the trial court's ruling in this matter would have been different.
 {¶ 77} We also disagree with the appellant's contention that trial counsel's alleged failure to "scrutinize" the report of the guardian ad litem is actionable under these circumstances. This allegation patently lacks support such as an affidavit from trial counsel that he did not review or "scrutinize" the guardian's report. Moreover, assuming trial counsel did not scrutinize the guardian's report, appellant fails to explain how this would have altered the result in this case. The guardian's report to the trial court states fully:
 {¶ 78} "The Franklin County Public Defender first appeared in the interest of Rachel Kramer on August 13, 1999 in Case No. 99JU-9134, and he has appeared at all hearings on the child's behalf in both cases.
 {¶ 79} "In addition, all relevant reports from FCCS or any other interested parties have been reviewed.
 {¶ 80} "The GAL has consulted with representatives of FCCS, the Franklin County Prosecutor's Office, and with Counsel for the various parties to the case.
 {¶ 81} "The GAL has spoken with a representative of the Columbus Police Department about the case.
 {¶ 82} "There has been regular contact with representatives of FCCS.
 {¶ 83} "There has been no direct contact with the child because of her tender age."
 {¶ 84} The report regarding Phillip Kramer is identical.
 {¶ 85} Finally, appellant claims that counsel was not acting as counsel guaranteed by the Sixth Amendment to the United States Constitution because he did not call the guardian ad litem as a witness. However, under the circumstances, we find that the decision not to call the guardian ad litem as a witness strongly appears to have been a matter of trial strategy, and not a mistake attributable to counsel's incompetence. Accordingly, appellant's third assignment of error is overruled.
 {¶ 86} Having overruled all three of the appellant's assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.
Judgment affirmed.
WRIGHT and KLATT, JJ., concur.
WRIGHT, J., retired of the Ohio Supreme Court, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.